Filed 9/26/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LEAH LEVI, Plaintiff and Appellant, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents. | D069526 (Super. Ct. No. 37-2014-00027582-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed in part and reversed in part.

The Watkins Firm, Daniel W. Watkins and Nancy A. Correa for Plaintiff and Appellant.

Andrews Lagasse Branch & Bell, Margaret C. Bell and Shauna L. Sinnott for Defendants and Respondents.

Dr. Leah Levi, a neuro-ophthalmologist, appeals from a summary judgment in favor of her former employer, the Regents of the University of California (Regents), and

---

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I and III through IX.

Dr. Robert Weinreb, the chair of the department of ophthalmology at the University of California, San Diego (University). Levi asserted various causes of action against the Regents and Weinreb related to discrimination, harassment, retaliation, and due process violations. The retaliation claims alleged protected conduct under both California's Whistleblower Protection Act (Gov. Code, § 8547 et seq. (CWPA)) and Fair Employment and Housing Act (Gov. Code, § 12900 et seq. (FEHA)).

Levi contends the trial court granted summary judgment based on its mistaken application of the law. She argues she raised factual issues as to each of her causes of action, including (1) whether she engaged in a protected activity under the FEHA and whether that activity was connected to an adverse employment action; (2) whether she made a protected disclosure of improper governmental activity or a condition threatening the health and safety of the public to support her CWPA retaliation claim; (3) whether the Regents' proffered nondiscriminatory reasons for taking adverse employment actions against her were merely a pretext; (4) whether she was subjected to unwelcome conduct due to her gender that was severe enough or sufficiently pervasive to alter the conditions of her employment; (5) whether the Regents took reasonable steps to prevent discrimination, retaliation, and harassment; (6) whether the Regents and Weinreb denied her due process by failing to issue reports on grievances she had filed, failing to provide her notice before reducing her salary and appointment, and failing to provide her an opportunity to cure deficiencies and return to good standing; and (7) whether the Regents and Weinreb interfered with her constitutional and statutory rights by threats, intimidation, or coercion. We conclude Levi raised triable issues of fact sufficient to

2

defeat summary judgment on her second cause of action for retaliation under the CWPA and sixth cause of action for due process violations. Accordingly, we reverse the trial court's order granting summary judgment and direct the court to grant Weinreb and the Regents' alternative motion for summary adjudication on Levi's remaining causes of action for retaliation under the FEHA, gender discrimination, gender harassment, failure to prevent harassment, discrimination, retaliation, and Tom Bane Civil Rights Act (Civ. Code, § 52.1 (Bane Act)) violations.

FACTUAL AND PROCEDURAL BACKGROUND

*Levi's Complaints Against Weinreb*

In 1990, Levi joined the department of ophthalmology at the University as an assistant professor in residence. In 2003, she was appointed as the residency program director for the department and earned a stipend for the position. Weinreb had been on the faculty with the department of ophthalmology since 1984. In 2009, Weinreb's wife, Dr. Cristiana Vasile, applied for a resident position in the department. Levi asked Weinreb to recuse himself from the resident selection process to avoid inferences of impropriety.

As a result of Vasile's residency application, the University received an anonymous whistleblower complaint in 2009 alleging Weinreb had a conflict of interest because he was the vice chair of the department at that time. The University conducted an investigation regarding the complaint and Levi participated in that investigation. After the University informed Weinreb about the complaint, he questioned Levi about it. The investigation concluded that the whistleblower's claims were unsubstantiated.

3

Vasile was ultimately accepted into the residency program with a standard condition that she complete a one-year internship prior to starting the ophthalmology program. The University's internal medicine department requested that the ophthalmology department pay for Vasile's internship position. Thus, Weinreb transferred discretionary funds he had control over to the internal medicine department to pay for Vasile's internship at the University.

In 2011, Weinreb was appointed chair of the ophthalmology department. Shortly thereafter he made changes to the residency program, including delaying the orientation schedule and modifying policies pertaining to resident vacations, calls, and patient triaging. These changes benefited Vasile. When Levi told Weinreb that any change in the patient triaging policy had to be structured to ensure resident accountability and patient safety, Weinreb became angry and said, " 'I think I made myself clear.' "

In July 2011, Weinreb met with Levi and informed her that the residency program was " 'awful and embarrassing.' " Levi was surprised to hear Weinreb say that residents and faculty could not work with her. Levi had earned teaching awards and positive evaluations from a majority of the faculty. When Levi challenged Weinreb's characterization of the program and her relationships with colleagues, Weinreb stood up, banged his fist on the table in front of Levi and said, " 'I can remove you as [program director] if you keep fighting me every step of the way.' " Levi felt frightened, intimidated, and threatened by Weinreb. Weinreb calmed down after Levi asked him if he was threatening her and the meeting continued. Weinreb and Levi went on to discuss the appointment of an assistant residency program director.

4

During the July 2011 meeting, Weinreb and Levi also discussed Levi's clinical practice. At the time, Levi was seeing approximately 16 patients per week at University clinics. Weinreb asked Levi if she could see more patients. Levi knew that unlike most of the department faculty, her clinical practice did not cover her salary. She believed that increasing her patient load would decrease the amount of time she spent with each patient and impact the quality of care she provided. She also thought that Weinreb, as a glaucoma specialist, was not in a position to tell her, a neuro-ophthalmologist, how to practice.

Levi's relationship with Weinreb improved temporarily. Weinreb made positive comments about Levi to others and asked Levi to review important documents.

Around March 2012, the University received two more whistleblower complaints regarding Weinreb. One complaint alleged that Weinreb was showing favoritism toward Vasile, and the other alleged that the faculty was afraid to frankly evaluate Vasile because of possible retaliation by Weinreb. Levi did not make the complaints. Weinreb wondered whether Levi had filed the complaints and was furious about them.

In April 2012, Weinreb asked Levi to stay on as resident program director for one more year to continue mentoring Dr. Jeff Lee, who had been appointed assistant program director in August 2011. A month later, Weinreb and another physician met with Levi and told her to step down as program director. However, Levi informed them that she had no intention of stepping down. Weinreb and the other physician told Levi that it was time for a change in leadership, resident test scores were low, and the residency program

was not attracting high-quality applicants. In June 2012, Weinreb removed Levi as program director and shortly thereafter appointed Lee to replace her.

Immediately following her dismissal as program director, Levi filed three anonymous whistleblower complaints in one day against Weinreb. One complaint alleged Weinreb engaged in a "[c]oncerted effort" to dismiss Levi as program director as a result of prior whistleblower complaints that Weinreb believed Levi had filed. Another complaint alleged that decisionmaking in the ophthalmology department favored Weinreb's wife. The third complaint alleged Weinreb engaged in abusive behavior designed to intimidate people. Specifically, Levi claimed Weinreb attempted to undermine staff members' confidence, yelled at people, targeted people who he perceived were aligned with the prior chair of the ophthalmology department, and fired people who disagreed with him. In July 2012, shortly after filing her three anonymous whistleblower complaints, Levi filed another complaint with the office of the "Locally Designated Official" (LDO).

Irene Levintov from the University president's office investigated Levi's allegations to the LDO. Levi had alleged Weinreb behaved in an " 'intimidating and threatening manner,' " said " 'hurtful things,' " created " 'a hostile work environment,' " and was a " 'bully.' " In the LDO complaint, Levi also expressed concern that Weinreb retaliated against her by removing her from her position as residency program director because he believed she had filed prior whistleblower complaints against him alleging a conflict of interest. Levintov concluded Levi's allegations did not rise to the level of improper governmental activity and were not substantiated. However, based on her

6

investigation, Levintov concluded that Weinreb was a bully and created a stressful and hostile work environment. Levintov indicated that her definition of "hostile" was not in a "legal sense."

In September 2012, Levi filed a grievance alleging many of the same claims as her June and July 2012 complaints. Levi also alleged that Weinreb had funded Vasile's internship position in the internal medicine department.

In March 2013, Levi filed a complaint alleging that Weinreb retaliated against her for being a whistleblower. Specifically, Levi claimed that Weinreb excluded her from interviewing applicants for the residency program, excluded her from committees, and did not ask her to speak at a conference that he had organized with another physician.

*Levi's Salary and Appointment Reduction*

Levi had a split appointment between the University and the VA San Diego Healthcare System (VA), an affiliate of the University. Under the split appointment plan, the University counted service to the VA as part of a faculty member's commitment or "effort" to the University. The split appointment plan allowed for up to a maximum of 150 percent appointment split between the University and the VA. However, the University recognized a full-time faculty member's professional commitment or "effort" as 100 percent, even if the appointment between the VA and the University exceeded 100 percent. Thus, a faculty member could hold a 100 percent appointment at the University and a 50 percent appointment at the VA, but the total commitment to the University remained 100 percent. Levi had a 150 percent appointment, which included 100 percent to the University and 50 percent to the VA.

7

Levi's clinical practice was insufficient to cover her costs, resulting in a deficit to the department of ophthalmology. Levi knew that she had been in deficit for many years, but believed it was not a problem for the department. In June 2012, Weinreb and Catherine Ledford, the ophthalmology department's administrative vice chair, met with Ron Espiritu, the associate vice chancellor for the University health sciences' business and fiscal affairs, to discuss financially underperforming faculty, including Levi, and recommendations for remediation. Although there was enough patient volume for Levi to increase her patient visits, she was unwilling to see additional patients. Thus, Espiritu said the department could reduce Levi's University appointment from 100 percent to 50 percent to address her deficit.

Weinreb and Ledford met with Dr. Andrew Ries, associate vice chancellor for academic affairs, who was responsible for overseeing academic appointments and any actions that could involve a change in an academic appointment. Ries confirmed that the department could reduce Levi's University appointment from 100 percent to 50 percent due to Levi's inability to generate sufficient revenue to cover her costs. According to Ries, the change did not constitute an involuntary reduction of time because her total commitment to the University remained at 100 percent, split evenly between the University and the VA. Further, because Levi's salary after reduction of her University appointment still exceeded her guaranteed covered compensation, the change was not considered a layoff or a reduction in time or salary. Ries testified that the University reduced Levi's salary due to lack of sufficient funds to cover the cost of her University appointment, not as a corrective action.

8

At a meeting in October 2012, Weinreb stated that three faculty members were in deficit. Levi knew that she was one of those faculty members. She also knew that at least three male faculty members had previously been told they were in deficit. Two of those male faculty members resolved their deficit by cutting expenses or reducing their salary.

In March 2013, Levi received a letter from Espiritu, confirming that Levi's practice did not cover her base salary and expenses, and that the ophthalmology department had subsidized her costs. The letter informed Levi that because she was not covering her base salary, her University appointment would be reduced from 100 percent to 50 percent and her VA appointment would remain unchanged. As a result, Levi's salary would be adjusted to reflect the reduced University appointment. The letter went on to state that Dr. William Freeman, vice chair, would meet with Levi to discuss a plan to provide her additional clinic time and space in order for her to resolve her deficit. Further, Freeman would continue to meet with Levi monthly to monitor her progress and assist her in meeting her goals. Even with the University appointment and salary reductions, Levi's projected revenue would not cover her costs. Thus, the department would continue to provide Levi a subsidy of approximately $15,000 per year. The two other faculty members in deficit did not receive a letter similar to the one Espiritu sent to Levi.

In April 2013, Levi's attorney sent a letter to Espiritu challenging Levi's University appointment reduction and demanding that Levi be reinstated as the residency program

9

director.  The letter alleged that the Regents and University's conduct constituted retaliation, harassment, and gender and age discrimination.

Levi met with Freeman in June 2013.  During the meeting, Freeman and Levi discussed increasing Levi's clinical income.  Levi said that in order for her to see more patients, she needed more space and technical help.  Freeman suggested other options for Levi to increase her revenue.

In June 2013, Levi resigned effective July 1 of that year.  She felt that she had fulfilled the requirements of a faculty member, but continued to face hurdles at the University such as having her appointment reduced and being dismissed as residency program director.  She acknowledged that between March and June 2013 there was nothing inappropriate or problematic about her work environment.

*Levi's Complaint and the Motion for Summary Judgment*

In August 2014, Levi filed an action against the Regents and Weinreb.  In the operative amended complaint, she alleged causes of action against the Regents for retaliation under the FEHA; gender discrimination; and failure to prevent harassment, discrimination, and retaliation.  She also asserted claims for retaliation under the CWPA, gender harassment, violation of due process, and violation of the Bane Act against both the Regents and Weinreb.

Defendants moved for summary judgment or alternatively for summary adjudication of issues.  They argued Levi could not state a prima facie case of retaliation under the FEHA because she did not engage in a protected activity, there was no causal connection between an adverse employment action and a protected activity, and the

10

Regents had a legitimate business reason for her termination. Defendants claimed that Levi's second cause of action for retaliation in violation of the CWPA failed because her only disclosure of improper governmental activity was her April 2013 complaint involving gender discrimination, and there was no causal connection between that complaint and an adverse employment action. On Levi's claim of gender discrimination, the Regents argued Levi could not establish that she was constructively terminated or suffered an adverse employment action motivated by her gender. The Regents further asserted they had legitimate, nondiscriminatory reasons for their employment decisions, and Levi could not establish pretext. The Regents and Weinreb contended that Levi's gender harassment claim failed because she could not show conduct by Weinreb that was sufficiently severe or pervasive to rise to the level of harassment. According to defendants, Levi's failure to show harassment, discrimination and retaliation precluded her claim for failure to prevent such conduct. On Levi's due process cause of action, the defendants argued the notice and opportunity to cure provisions in the University's policies did not apply to Levi because her base salary was not reduced and her appointment remained at the guaranteed level of 100 percent. Lastly, defendants asserted that Levi's Bane Act claim failed because she could not show they interfered with her constitutional or statutory rights, and that any alleged interference was unaccompanied by actual or attempted threats, intimidation, or coercion.

Levi opposed the motion. She also filed multiple objections to each of five declarations the Regents and Weinreb submitted in support of their motion. The

11

objections did not quote or set forth the objectionable statements or material. Instead, Levi only identified paragraph numbers within the declarations.

In its tentative decision, the trial court overruled Levi's evidentiary objections based on her failure to comply with California Rules of Court, rule 3.1354(b),[1] which requires the objecting party to, among other things, quote or set forth the objectionable statements or material. At the hearing on the summary judgment motion, Levi submitted revised evidentiary objections to three of the five declarations. The revised objections quoted the objectionable statements in each declaration. The court informed Levi's counsel that it did not think Levi was entitled to file objections twice, but she could "file whatever [she thought she] need[ed] to file."

After hearing arguments on the motion, the court granted summary judgment and overruled Levi's evidentiary objections based on her failure to comply with rule 3.1354(b). The court also found Levi's revised evidentiary objections, filed at the time of the hearing on the summary judgment motion, were untimely under rule 3.1354(a), and that Levi had not established good cause for the untimely filing of the objections.

## DISCUSSION

"We review a summary judgment or summary adjudication ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. [Citation.] 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a

---

[1]    All further rule references are to the California Rules of Court.

12

trial court's determination of a motion for summary judgment.' [Citation.] '[W]e are not bound by the trial court's stated reasons for its ruling on the motion; we review only the trial court's ruling and not its rationale.' " (*Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 895.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

## I.  *FEHA Retaliation Claim*

Levi contends she established a prima facie case of retaliation under the FEHA with evidence that she engaged in a protected activity by participating in investigations of and filing complaints against Weinreb.  She further contends there was a causal connection between her protected activities and adverse employment actions.  As we shall explain, we conclude the trial court properly granted summary judgment because Levi did not engage in protected activity within the meaning of the FEHA prior to April 2013, and there was no causal link between a post-April protected activity and an adverse employment action.

### A.  *Summary Judgment Burden on Cause of Action for Retaliation Under the FEHA*

To make a prima facie case of retaliation, the plaintiff must establish "(1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse

13

employment action; and (3) a causal link between the protected activity and the employer's action." (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453.)

"[P]rotected conduct can take many forms. Specifically, [Government Code section 12940, subdivision (h)] makes it an unlawful employment practice '[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has *opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.*' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) "[A]n employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA." (*Id.* at p. 1043.) However, "an employee's unarticulated belief that an employer is engaging in [conduct prohibited by the FEHA] will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in [conduct violating the FEHA]." (*Id.* at p. 1046.) "[C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." (*Id.* at p. 1047.)

14

The causal link between an employee's protected activity and adverse employment action may be an inference raised by circumstantial evidence that the employer was aware the employee had engaged in protected activities and that the allegedly retaliatory employment decision was made in close proximity in time to the employee's participation in protected activities.  (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.)

*B.  Levi Failed to Establish She Engaged in Protected Activities Before April 2013*

Here, the parties do not dispute that Levi's April 2013 complaint was a protected activity under the FEHA.  Rather, they dispute whether Levi's participation in investigations or filing of complaints and grievances prior to April 2013 constituted protected activities.  Specifically, Levi relies on her participation in a 2009 investigation into a whistleblower complaint about Vasile's residency, her participation in two investigations in March 2012 regarding Weinreb and Vasile, her filing of complaints in June and July 2012 and a grievance in September 2012, and her filing of a complaint in March 2013.[2]  We address each of these items in turn.

---

[2]    To support her retaliation argument on appeal, Levi also references her participation in a November 2011 investigation by the University's labor relations, and discussions she had with Dr. Vivian Reznik, the assistant vice chair of faculty affairs, and Lori Chamberlain, the director of the office of prevention of harassment and discrimination, about Weinreb's conduct.  However, Levi did not allege retaliation based on these complaints and discussions in her amended complaint.  Further, she did not raise these complaints and discussions during summary judgment proceedings.  It is well settled that 'in reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal.  [Citation.]  Thus, possible theories that were not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal.  [Citations.]' "  (*Sacks v. FSR Brokerage, Inc*. (1992) 7 Cal.App.4th 950, 962 (*Sacks*); see also *County of Santa Clara v. Atlantic*

15

The 2009 anonymous whistleblower complaint alleged Weinreb had a conflict of interest because he was the vice chair of the ophthalmology department at the time Vasile applied for a position in the department's residency program. Levi participated in the investigation of that complaint. Levi argues the 2009 complaint alleged harassment and discrimination prohibited by the FEHA. However, the evidence indicates otherwise. Levi admitted the complaint was limited to the issue of the fairness of the residency application process. Favoritism toward a paramour does not constitute sexual harassment or discrimination. (*Proksel v. Gattis* (1996) 41 Cal.App.4th 1626, 1630 (*Proksel*).) Accordingly, Levi did not engage in protected activity by participating in the investigation of the 2009 whistleblower complaint.

Similarly, Levi's participation in two investigations in March 2012 regarding Weinreb and Vasile did not implicate the FEHA. The complaints alleged Weinreb was showing favoritism toward Vasile by changing the vacation policy and on-call schedule for residents and that faculty members were afraid to fairly evaluate Vasile. The evidence in the record indicates that the policy changes impacted all residents equally and did not negatively impact Levi. Further, although Levi generally states the complaints involved harassment and discrimination, she does not explain how the complaints implicated the FEHA. For example, she does not contend the complaints arose from Weinreb's discrimination against or harassment of any employee based on protected

*Richfield Co.* (2006) 137 Cal.App.4th 292, 332 [" 'The burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*. A "moving party need not '. . . refute liability on some theoretical possibility not included in the pleadings.' " ' "].)

16

grounds, including gender. (Gov. Code, § 12940, subd. (a).) She does not argue that the complaints involved allegations that Weinreb led employees to believe they could obtain favorable treatment from him if they became romantically involved with him. Based on the evidence in the record, the March 2012 complaints did not implicate the FEHA.

Next, Levi argues her filing of complaints in June and July 2012 and a grievance in September 2012 involved conduct prohibited by the FEHA. Specifically, she contends those complaints alleged Weinreb "sexually favored Vasile, treated Levi and other women worse than men, behaved abusively, retaliated, was a bully, and created a hostile workplace." Levi mischaracterizes the complaints. Based on our review of the record, Levi's complaints alleged Weinreb retaliated against her based on her involvement in the 2009 and March 2012 whistleblower complaints, decisionmaking in the ophthalmology department favored Vasile, Weinreb engaged in abusive behavior to intimidate people, Weinreb targeted people who he believed were aligned with the prior department chair or disagreed with Weinreb, and Weinreb was a bully. The September 2012 grievance alleged the same claims as her June and July 2012 complaints.

As we have already stated, the 2009 and March 2012 whistleblower complaints did not involve protected activity under the FEHA. Thus, Levi's 2012 complaints alleging that Weinreb retaliated against her based on her participation in the earlier whistleblower investigations do not support her retaliation claim under the FEHA. Further, Levi's contention that Irene Levintov, a University investigator, concluded that Levi's participation in the whistleblower investigations were protected activities because the complaints alleged a hostile workplace is inaccurate. Levintov did not make a finding

17

of protected activity under the FEHA. Rather, she determined that Levi engaged in an activity protected by the University's whistleblower policy. In that context, Levintov investigated whether Levi participated in a complaint disclosing an improper governmental activity, as defined in Government Code section 8547.2 (see part IV, *post*) or a serious or substantial violation of University policy. She did not find any improper governmental activity, but determined Levi made a protected disclosure by "participat[ing] in the whistleblower investigation interview process."

Similarly, Levintov did not find harassment or hostile work environment within the meaning of FEHA. Rather, she determined that Weinreb was a bully, which created a stressful and hostile workplace. Her definition of "hostile" was not a legal conclusion for purposes of the FEHA. According to Levintov, Levi alleged that Weinreb created a "hostile [work] environment," but Levi did not use that term to mean sexual harassment. Instead, "hostile work environment" meant a difficult place to work with tough management. Nothing in Levi's complaints about Weinreb's conduct—including that he was a bully, engaged in abusive behavior to intimidate people, and targeted people who he believed were aligned with the prior department chair or disagreed with Weinreb— suggested that Weinreb was treating Levi or any other employee differently based on a protected characteristic.

In regard to Levi's complaint that Weinreb made changes to department policies to favor Vasile, such conduct is not prohibited by the FEHA. The policy changes impacted all residents equally. Further, "by itself preferential treatment of paramours is not actionable by other employees." (*Proksel, supra*, 41 Cal.App.4th at p. 1627.) However,

18

"sexual favoritism by a manager may be actionable when it leads employees to believe that 'they [can] obtain favorable treatment from [the manager] if they became romantically involved with him' [citation], the affair is conducted in a manner 'so indiscreet as to create a hostile work environment,' or the manager has engaged in 'other pervasive conduct . . . which created a hostile work environment.' " (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 465 (*Miller*).) Levi argues the evidence satisfied the second criterion because Weinreb engaged in "an indiscreet pattern of favoritism . . . , commencing with Vasile's application to the residency program and continuing throughout her residency." Levi's misapplies the legal standard. The question is not whether Weinreb engaged in indiscreet attempts to change policies for his wife. Rather, in determining whether sexual favoritism is actionable, the evidence must show the romantic relationship was conducted in a manner so indiscreet as to create a hostile work environment. Levi has not pointed to any evidence to support that theory.

Levi further argues the evidence satisfied the third criterion because Weinreb's "favoritism towards Vasile was accompanied by harassment, bullying, threats, and intimidation toward those who did not acquiesce." Levi does not point to evidence that Weinreb's harassment, bullying, threats and intimidation were related to a characteristic protected under the FEHA. Moreover, there is no indication that Weinreb's conduct in favoring Vasile "convey[ed] the message that a woman cannot be 'evaluated on grounds other than her sexuality.' " (*Miller, supra*, 36 Cal.4th at p. 465.)

Based on the foregoing, we conclude Levi did not engage in protected conduct by filing the June and July 2012 complaints and September 2012 grievance because the

19

complaints and grievance did not oppose a practice forbidden by the FEHA. There is nothing in the complaints and grievance that would have put the University, the Regents, or Weinreb on notice of unlawful discrimination or harassment under the FEHA.

Lastly, Levi relies on her filing of a complaint in March 2013 to support her retaliation claim under the FEHA. In the March 2013 complaint, Levi alleged that Weinreb excluded her from interviewing applicants for the residency program, excluded her from committees, and did not ask her to speak at a conference because she was a whistleblower in the past or participated in whistleblower investigations. Again, nothing in the March 2013 complaint suggests harassment or discrimination based on gender or any other protected grounds under the FEHA.

In sum, Levi failed to establish that she engaged in any protected activity prior to April 2013. Further, even if Levi had a good faith belief that she engaged in protected activities before April 2013, her belief is not sufficient "to establish protected conduct for the purposes of establishing a prima facie case of retaliation." (*Yanowitz, supra*, 36 Cal.4th at p. 1046.) Rather, there must be "evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Ibid*.) There was nothing in Levi's complaints to put the University on notice that it should investigate claims of discrimination or harassment based on gender. (*Id.* at p. 1047.) Although Levi was not required to use legal terms or buzzwords in her complaints (*ibid.*), she was required to sufficiently convey to her employer that it had or was acting in an unlawful harassing or discriminatory manner. Levi's complaints before April 2013 did not satisfy this standard.

20

*C. Levi Failed to Establish a Causal Connection Between Her April 2013 Complaint and an Adverse Employment Action*

The parties do not dispute that the letter from Levi's attorney to Espiritu in April 2013 constituted protected activity under the FEHA. However, Levi failed to establish a causal connection between that letter and an adverse employment action. The evidence reveals that the majority of the adverse employment actions upon which Levi relies occurred prior to April 2013. For example, Weinreb dismissed her as program director in June 2012, excluded her from interviewing residency applicants in November 2012, and did not ask her to speak at an ophthalmology conference in February 2013. Further, the University reduced Levi's appointment and salary in March 2013. Because these employment actions occurred before Levi's April 2013 letter, there is no causal connection between Levi's protected activity and the University's employment actions.

Levi argues she suffered an adverse employment action as a result of her April 2013 complaint because she was constructively discharged. "[C]onstructive discharge occurs only when an employer terminates employment by forcing the employee to resign." (*Mullins v. Rockwell Internat. Corp.* (1997) 15 Cal.4th 731, 737, citing *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244 (*Turner*).) "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Turner,* at p. 1246.) "In order to amount to a constructive discharge,

21

adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Id.* at p. 1247, fn. omitted.)

The determination whether intolerable working conditions existed at the time of an employee's resignation is an objective one. (*Turner, supra*, 7 Cal.4th at p. 1248.) "[T]he question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' " (*Id*. at p. 1248.) Whether conditions were so intolerable that a reasonable employee would be justified in resigning is ordinarily a question of fact. (*Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056.) Yet "in some situations a court may conclude as a matter of law that a reasonable employee would not have felt compelled to resign." (*Kovatch v. Cal. Casualty Management Co*. (1998) 65 Cal.App.4th 1256, 1267.) In those cases, summary judgment is proper. (*Ibid*.)

Here, Levi contends "Weinreb orchestrated Levi's exit plan" and, together with the University, "devised strategies to get rid of [her]." She alleges that Weinreb and the University punished her by removing her contact with residents and by instructing her to increase her income, see more patients, and quit providing care to indigent patients. While Levi may not have liked Weinreb's and the University's decisions, these circumstances do not establish the existence of an objectively intolerable work environment. "In order to properly manage its business, every employer must on occasion review, criticize, demote, transfer and discipline employees." (*Cole v. Fair Oaks Fire Protection Dist*. (1987) 43 Cal.3d 148, 160.) An employee may consider adverse personnel decisions improper, but "demotions, promotions, criticism of work

22

practices, and frictions in negotiations as to grievances" are a normal part of the employment relationship. (*Ibid.*; *Turner, supra*, 7 Cal.4th at p. 1247 ["a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge"].)

Moreover, Levi testified that between March and June 2013, there was nothing inappropriate or problematic about her work environment. This testimony reveals that "under all the circumstances, the working conditions [were not] so unusually adverse that a reasonable employee" would have felt compelled to resign. (*Turner, supra*, 7 Cal.4th at p. 1247.) Absent constructive discharge, Levi cannot establish a causal connection between her April 2013 protected activity and an adverse employment action.

## II. *CWPA Retaliation Claim*

Levi argues the trial court erred in granting summary judgment on her claim of retaliation under the CWPA based on the trial court's finding that she did not make a protected disclosure of improper governmental activity. She also contends the trial court failed to consider that her complaints alleged health and safety concerns, which constituted protected disclosures under the CWPA. Lastly, she argues the trial court failed to consider her good faith belief that she participated in protected disclosures.

The CWPA "prohibits retaliation against state employees who 'report waste, fraud, abuse of authority, violation of law, or threat to public health [citation]." (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 882.) A protected disclosure under the CWPA is "a good faith communication, including a communication based on, or when carrying out, job duties, that discloses or demonstrates an intention to disclose

23

information that may evidence (1) an improper governmental activity, or (2) a condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition." (Gov. Code, § 8547.2, subd. (e).)

Under Government Code section 8547.2, subdivision (c), " '[i]mproper governmental activity' means an activity by a state agency or by an employee that is undertaken in the performance of the employee's duties, undertaken inside a state office, or, if undertaken outside a state office by the employee, directly relates to state government, whether or not that activity is within the scope of his or her employment, and that (1) is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty, (2) is in violation of an Executive order of the Governor, a California Rule of Court, or any policy or procedure mandated by the State Administrative Manual or State Contracting Manual, or (3) is economically wasteful, involves gross misconduct, incompetency, or inefficiency."

Levi based her retaliation claim under the CWPA on the same investigations, complaints, and grievances as her retaliation claim under the FEHA. Those complaints and grievances alleged: (1) Weinreb had a conflict of interest related to Vasile's residency application because he was the vice-chair of the ophthalmology department at the time; (2) Weinreb showed favoritism toward Vasile by changing department policies to benefit her; (3) faculty members were afraid to fairly evaluate Vasile because of

24

possible retaliation by Weinreb; (4) Weinreb retaliated against Levi because he thought she was a whistleblower; (5) Weinreb engaged in abusive behavior to intimidate people; and (6) Weinreb improperly funded Vasile's internship position with money from the internal medicine department.

Levi argues her complaints and those in which she participated were disclosures of improper governmental activities because they alleged violations of state laws. Specifically, she contends the complaints at issue implicated violations of the Regents' conflict of interest, near relative, code of conduct, whistleblower, and nondiscrimination policies, which have the effect of statutes. In making this argument, Levi relies on a series of cases in which courts have concluded that the Regents' " 'policies and procedures have the force and effect of statute.' " (*Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 198, 207 (*Lachtman*); see also *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 135 (*City of Santa Monica*); *Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165 (*Kim*); *People v. Lofchie* (2014) 229 Cal.App.4th 240, 260 (*Lofchie*).)

The Regents contend that if complaints about violations of the Regents' policies constituted protected activities under the CWPA, it would lead to absurd results. For example, the Regents emphasize that if complaints about minor violations of the Regents' policies, such as parking without a permit, establish a protected activity, it would result in countless lawsuits under the CWPA. While the Regents' argument has some intuitive appeal, we find Levi's argument has merit to the extent she complained about or participated in complaints that serve the public's interest and went beyond mere

25

administrative or personnel matters. (See Gov. Code, § 8547.1 ["[P]ublic servants best serve the citizenry when they can be candid and honest without reservation in conducting the people's business."].)

The University of California " 'is a statewide administrative agency with constitutionally derived powers. [Citations.] Its employees are public employees. [Citation.] The University is administered by the Regents. [Citation.] Regents have rulemaking and policymaking power in regard to the University; their policies and procedures have the force and effect of statute. [Citation.]' " (*Lachtman, supra*, 158 Cal.App.4th at pp. 198, 207 [Regents' policies that controlled the terms of plaintiff's employment had the force and effect of statutes]; see also *Kim, supra*, 80 Cal.App.4th at p. 164 [same]; *City of Santa Monica, supra*, 77 Cal.App.3d at p. 135 [" ' "[T]he power of the Regents to operate, control, and administer the University is virtually exclusive" ' " and "policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes [citation]."].)

Here, the complaints and grievances Levi filed or participated in alleged Weinreb had a conflict of interest in Vasile's residency application, made department decisions to favor Vasile, retaliated against Levi for being a whistleblower, and was generally a bully who intimidated people. In our view, complaints that Weinreb created a stressful work environment by yelling, undermining employees' confidence through statements that they were performing poorly, and saying hurtful things are not protected disclosures under the CWPA, even if the conduct violated the Regents' policies, because the complaints are "akin to internal personnel or administrative disclosures." (*Conn v. Western Placer*

26

*Unified School Dist*. (2010) 186 Cal.App.4th 1163, 1182.) Complaints made "in the context of internal administrative or personnel actions, rather than in the context of legal violations" do not constitute protected whistleblowing. (*Ibid.*; *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1385.) "To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." (*Patten,* at p. 1385 [considering protected activity for whistleblower retaliation claim under Lab. Code, § 1102.5, subd. (b)].)

In contrast, the complaints Levi filed or participated in—alleging Weinreb had conflicts of interest related to Vasile's residency application, modified policies to favor Vasile, retaliated against Levi for being a whistleblower or participating in whistleblower investigations, and improperly funded Vasile's internship at the University—implicated policies that have the force and effect of statutes.

In *Lofchie*, the court examined several of the Regents' policies at issue in this case, including policies concerning conflicts of interest and restrictions on staff participation in employment decisions involving near relatives. (*Lofchie, supra*, 229 Cal.App.4th at p. 260.) The issue was whether a University "faculty member may be criminally prosecuted under Government Code section 1090 for participating in a decision to hire his wife as a program assistant for a four-week study abroad course." (*Lofchie, supra*, 229 Cal.App.4th at p. 245, fn. omitted.) In concluding that the faculty member could not be

27

criminally prosecuted, the court noted that "the University has adopted detailed conflict of interest policies, including policies and procedures governing the employment of relatives and near relatives of University employees," which could subject a violator to discipline. (*Id.* at p. 260.) "Allowing the People to sanction [the faculty member] under [Government Code] section 1090 would infringe upon not only the University's conflict of interest policies, but its internal disciplinary policies as well. These policies 'enjoy a status equivalent to that of state statutes. [citation.]' [Citation.] Their impairment would substantially interfere with the Regents' full powers of governance over University affairs." (*Ibid.*) In other words, Government Code section 1090 did not apply because there was a corresponding Regents' policy that was the functional "equivalent" of the otherwise applicable state statute.

Although *Lofchie* did not consider the Regents' conflict of interest and near relative policies in the context of the CWPA, we see no reason to depart from the conclusion that those policies enjoy a status equivalent to state statutes for purposes of whistleblower protection. (See *Lofchie, supra*, 229 Cal.App.4th at p. 260.) Exposing conflicts of interest, misuse of funds, and improper favoritism of a near relative at a public agency are matters of significant public concern that go well beyond the scope of a similar problem at a purely private institution. State employees should be free to report violations of those policies without fear of retribution. (Gov. Code, § 8547.1.) At least where the Regents' policy being relied on corresponds to a more general policy reflected in state statutes applicable to other state entities, complaints about their violations may constitute protected activities under the CWPA.

28

Based on our conclusion that Levi raised a triable issue of fact as to whether she made or participated in complaints that constituted protected disclosures under the CWPA, we need not consider Levi's contention that the trial court erred by failing to consider that she had a good faith belief that she made or participated in a protected disclosure under the CWPA.[3]

Lastly, a triable issue of facts exists as to whether Levi suffered retaliation as a result of the whistleblower complaints she filed or in which she participated. There was evidence she suffered at least one adverse employment action, including her removal as residency program director and her reduction in salary and appointment, after making or participating in a protected disclosure. The timing and circumstances surrounding the employment actions raise at least a reasonable inference that they could be connected to the protected activities.

### III. *FEHA Gender Discrimination Claim*

The trial court concluded Levi made a prima facie case of gender discrimination based on evidence that she suffered an adverse employment action and Weinreb was dismissive, yelled at females and called them names, was rude to female staff and patients, expected different reactions from women (including Levi) than he expected

---

[3] Levi also asserts for the first time on appeal that the complaints she participated in and filed in 2012 disclosed health and safety issues for University personnel and the public. Specifically, she contends patient health and safety were at risk because faculty and staff could not fairly evaluate Vasile or speak up about her errors. Even if Levi did not forfeit this theory by failing to raise it in the trial court, it has no merit. Even broadly construing the complaints in this case, Levi did not complain or participate in a complaint that made allegations concerning patient health and safety.

29

from men, treated women more poorly than men, and maintained a collegial rapport with male residents while completely ignoring their female counterparts. However, the court found that the Regents established a nondiscriminatory reason for its employment actions involving Levi, and Levi did not establish those reasons were a pretext for gender discrimination. On appeal, Levi challenges only the court's finding that she did not establish the Regents' proffered reasons for taking adverse employment actions against were merely a pretext.

Under the FEHA, an employer is prohibited from discriminating against an employee based on gender. (Gov. Code, § 12940, subd. (a).) The court applies a "three-stage burden-shifting test" for discrimination claims. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*); *Yanowitz, supra*, 36 Cal.4th 1028, 1042.) At trial, the plaintiff employee bears the initial burden of establishing a prima facie case of discrimination. If he or she does so, a presumption of discrimination arises. (*Guz*, at p. 354; *Yanowitz*, at p. 1042.) The burden then shifts to the employer to rebut the presumption by producing admissible evidence that its adverse employment action was taken for a legitimate, nondiscriminatory reason. (*Guz*, at pp. 355-356; *Yanowitz*, at p. 1042.) If the employer succeeds, the burden shifts back to the plaintiff to "attack the employer's proffered reasons as pretexts for discrimination," or to offer other evidence of intentional discrimination. (*Guz*, at p. 356; *Yanowitz*, at p. 1042.)

Here, the Regents produced evidence that they removed Levi as residency program director to improve the program, they reduced Levi's appointment with the University because she was not generating sufficient income to cover her costs, Levi was

30

excluded from the education committee because Lee took her spot when he became program director, Levi was not included in resident interviews because the education committee decided to limit the interviewers to the committee members and recent graduates, and Levi was not asked to speak at the 2013 ophthalmology conference because she had declined the opportunity in 2012 and her replacement had received positive reviews.

As evidence of pretext, Levi refers to several circumstances. First, she points to the "shifting reasons" Weinreb offered to justify her dismissal as program director. She maintains that Weinreb initially told her it was time for a change because residents disliked her and faculty could not work with her. Weinreb later stated residents' test scores were low and the program was not attracting high quality applicants. Levi contends the proffered reason for her dismissal as program director subsequently changed to concerns about residents not passing their board exams.

Shifting reasons alone are insufficient to raise a triable issue that the proffered reasons were pretextual. "[A]n inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (*Guz, supra*, 24 Cal.4th at pp. 360-361.)

31

In the case before us, Weinreb's multiple reasons for removing Levi as program director cannot reasonably be interpreted as a screen for gender discrimination. Almost immediately after becoming chair of the ophthalmology department, Weinreb informed Levi that the residency program was " 'awful and embarrassing' " and discussed the appointment of an assistant program director with her. Shortly thereafter, Lee became assistant program director. Less than one year later, Weinreb and another physician asked Levi to step down and when she protested, they provided additional reasons for the need for a change in leadership. Those reasons were not so much "shifting reasons," but rather more specific in that resident test scores were low and the program was not attracting high quality applicants. Lastly, although Levi emphasizes that her dismissal could not have been related to residents failing their board exams because those test scores were not known until weeks after her dismissal, that alone does not support a rational inference of intentional discrimination based on gender. Levi did not present evidence that she was removed as program director for a discriminatory reason.

Levi next argues she established pretext because, before reducing her appointment, salary, and benefits, Weinreb and the University did not provide her notice, counsel her about reducing her deficit, or give her resources to improve as they had done with two male faculty members who were not covering their costs. However, the evidence indicates that Levi knew her clinical practice was not covering her costs and Weinreb had asked her to see more patients shortly after he became the department chair. Levi believed that Weinreb should not be telling her how to practice and that increasing her patient load would impact the quality of care she provided. Further, Levi knew that at

32

least three male faculty members had previously been told they were in deficit. Two of those male faculty members resolved their deficit by cutting expenses or reducing their salary. Lastly, the University attempted to provide Levi with resources and suggestions on how to increase her revenue. Levi's subjective opinion that the Regents did not provide her with notice and resources to reduce her deficit is contradicted by the record and does not raise a triable issue of fact on the issue of pretext.

Levi also argues there were factual disputes about whether the data used to determine she was not covering her expenses was accurate. However, an employer may take adverse employment action against an employee based on " ' "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." ' " (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 21.) " ' " '[T]he relevant question is . . . whether the given reason was a pretext for illegal discrimination.' " ' " (*Ibid.*) Even if the data regarding Levi's profitability was inaccurate, she has not shown that the Regents or the University discriminated against her based on her gender. There was no evidence to suggest that inaccurate data was specifically generated to make her look bad; indeed, male faculty members were also given information indicating they were in deficit. Moreover, although Levi claimed that the University did not consider certain income streams when it concluded that she was not generating enough profit, she does not point to anything suggesting this was related to her gender. She acknowledged that other clinicians were not credited for some of the same items. Accordingly, the alleged errors in determining Levi's profitability do not support a finding of pretext.

33

Similarly, the fact that Espiritu did not send letters to male faculty members informing them they were in deficit and reducing their appointments does not show pretext. Based on the evidence, male faculty members were informed they were in deficit. Those male faculty members either reduced their salary or expenses to cure the deficit. The record does not support a reasonable inference that the University sent Levi a letter, but did not send similar correspondence to male faculty members, based on gender.

Next, Levi contends she established pretext based on evidence that the University violated its policies in handling Levi's salary and appointment reduction. However, "[a] mere failure to follow formal internal policies does not support a discrimination claim." (*Guz, supra*, 24 Cal.4th at p. 377 (conc. opn. of Chin, J.).) " 'The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action.' " (*Id.* at p. 378.) Levi did not meet that burden.

Based on the foregoing, we conclude Levi failed to establish the Regents' proffered reasons for taking adverse employment actions against her were merely a pretext for gender discrimination.

## IV. *Gender Harassment Claim*

On her claim of harassment based on gender, Levi argues the trial court erred in finding (1) there was no evidence of "sexual acts or words," (2) the conduct Levi relied on was not sufficiently pervasive to constitute a hostile work environment, and (3) the employment actions Levi relied upon did not support her harassment claim because they

34

were personnel actions. We conclude Levi failed to raise a triable issue of fact as to whether she was subjected to harassment due to her gender that was sufficiently pervasive to alter the conditions of employment and create an abusive working environment.

FEHA prohibits employer harassment "because of . . . sex." (Gov. Code, § 12940, subd. (j)(1).) Harassment "because of sex" includes sexual harassment and gender harassment. (Gov. Code, § 12940, subd. (j)(4)(C).) The "[s]exually harassing conduct need not be motivated by sexual desire." (*Ibid*.) " 'California case law recognizes two theories upon which sexual harassment may be alleged. The first is quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances. The second is hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment. [Citation.]' " (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1045.) Levi asserted the hostile work environment theory.

To prevail on a claim of gender harassment, the employee must show he or she was subject to harassment *due to his or her gender* that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 280, 283 (*Lyle*); *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 516 (*Beyda*).) In *Oncale v. Sundowner Offshore Servs., Inc*. (1998) 523 U.S. 75, the United States Supreme Court observed that antidiscrimination law is not a "general civility code." (*Id*. at p. 81.) "Title VII does not prohibit all verbal or physical harassment in the workplace;

35

it is directed only at '*discrimination* . . . because of . . . sex' " in the " 'terms or conditions of employment to which members of the other sex are not exposed.' " (*Id.* at p. 80.)[4]

To be actionable, " 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' [Citation.] The work environment must be viewed from the perspective of a reasonable person in the plaintiff's position, considering ' "all the circumstances." ' [Citation.] This determination requires judges and juries to exercise '[c]ommon sense, and an appropriate sensitivity to social context' in order to evaluate whether a reasonable person in the plaintiff's position would find the conduct severely hostile or abusive." (*Beyda, supra*, 65 Cal.App.4th at pp. 518-519.)

"Harassment against others in the workplace is only relevant to the plaintiff's case if she has personal knowledge of it. Unless plaintiff witnesses the conduct against others, or is otherwise aware of it, that conduct cannot alter the conditions of her employment and create an abusive working environment. Stated another way, a reasonable person in plaintiff's position would not find the environment hostile or abusive unless that person had knowledge of the objectionable conduct toward others." (*Beyda, supra*, 65 Cal.App.4th at p. 520.) "Generally, however, sexual conduct that involves or is aimed at

---

4     "In general, 'The language, purpose and intent of California and federal antidiscrimination acts are virtually identical. Thus, in interpreting FEHA, California courts have adopted the methods and principles developed by federal courts in employment discrimination claims arising under' the federal acts." (*Reno v. Baird* (1998) 18 Cal.4th 640, 659.)

36

persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff." (*Lyle, supra*, 38 Cal.4th at p. 284.)

Here, to support her harassment claim, Levi relied on three incidents in which she felt Weinreb threatened her. First, in July 2011, when Levi challenged Weinreb's characterization of the residency program as " 'awful and embarrassing' " and her relationships with other faculty members, Weinreb stood up, towered over Levi, banged his fists on the table in front of her, and said he could remove her as program director. Second, in December 2011, when Levi questioned Weinreb's decision about a policy change, Weinreb became angry and said, " 'I think I made myself clear.' " Third, in June 2012, Weinreb yelled, " 'I insist that we meet now' " when Levi said she was unavailable for meeting. Levi also presented evidence that staff members complained Weinreb was a bully and were afraid of him. In most cases, the staff members who were frightened were women, and the evidence suggested Weinreb treated women more poorly then men. Weinreb also called women names, such as stupid and obese.

First, in regard to the three incidents in which Weinreb became angry with Levi, yelled at her, and was aggressive, there was no indication that the incidents occurred because of Levi's gender. Instead, each incident occurred at times when Levi was opposing a directive from Weinreb or challenging him. The evidence showed that Weinreb also had heated arguments with male faculty members to the "point of coming to blows." During Weinreb's arguments with Levi, he did not make any comments directly targeting her gender or that were sexually objectionable. Further, the three

incidents do not reveal "a concerted pattern of harassment of a repeated, routine, or a generalized nature." (*Lyle, supra*, 38 Cal.4th at p. 283.)

Second, although Levi pointed to evidence that Weinreb treated women more poorly than men and women feared him, this evidence was largely from the testimony of others. Levi admitted she did not observe Weinreb treating women differently than men or hear him make negative comments about women. Instead, she had only heard about it. "[M]ere workplace gossip is not a substitute for proof. Evidence of harassment of others, and of a plaintiff's awareness of that harassment, is subject to the limitations of the hearsay rule. It is not a substitute for direct testimony by the victims of those acts, or by witnesses to those acts." (*Beyda, supra*, 65 Cal.App.4th at p. 521.)

Further, the evidence demonstrated that both men and women considered Weinreb to be unfriendly, he criticized and was disrespectful to both men and women, men likewise felt excluded from department decisions, and both women and men left the ophthalmology department because of his behavior. Levi did not demonstrate by any qualitative or quantitative measure that Weinreb treated women and men differently because of their sex.

Third, Levi based her harassment claim on allegations that Weinreb engaged in favoritism toward his wife. However, the policy changes Weinreb made to benefit Vasile did not impact Levi or anyone else in the department negatively and the policies applied to male and female residents. Further, there was no evidence that Weinreb's favoritism was based on gender or that it altered the conditions of Levi's employment.

38

Lastly, Levi alleged that the adverse employment actions taken against her, including her removal as residency program director and replacement by a male physician, and the reduction in her salary and appointment, supported her harassment claim. However, " 'commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. These are actions of a type necessary to carry out the duties of business and personnel management. These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management. This significant distinction underlies the differential treatment of harassment and discrimination in the FEHA.' " (*Reno v. Baird, supra,* 18 Cal.4th at pp. 646-647.) However, harassment may result from employment actions that contribute to a hostile message. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 708.) In this case, Levi did not point to any evidence that employment actions against her conveyed a hostile message based on her gender.

Based on the foregoing, we conclude Levi did not raise a triable issue of fact on her hostile work environment gender harassment claim.

V. *Failure to Prevent Harassment, Discrimination, and Retaliation Claim*

Levi argues a triable issue of fact exists as to whether or not the Regents took reasonable steps to prevent discrimination, retaliation, and harassment. We disagree.

Under the FEHA, it is an unlawful employment practice "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (Gov. Code, § 12940, subd. (k).) "An actionable claim under [Government Code] section 12940, subdivision (k) is dependent on" viable underlying claims for retaliation, discrimination, and harassment. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1021 (*Scotch*); *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 (*Trujillo*).) "Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented." (*Trujillo*, at p. 289.)

Because we affirm summary judgment on Levi's retaliation, discrimination, and harassment causes of action under the FEHA, we also affirm summary judgment on her failure to prevent harassment, discrimination, and retaliation claim against the Regents. (*Scotch, supra*, 173 Cal.App.4th at p. 1021; *Trujillo, supra*, 63 Cal.App.4th at p. 289.)

VI. *Due Process Claim*

Levi argues she raised a triable issue of fact as to whether the Regents and Weinreb denied her due process by failing to issue reports on grievances she had filed,

failing to provide her notice before reducing her salary and appointment, and failing to provide her an opportunity to cure deficiencies and return to good standing.[5]

"[T]he University is a ' " ' "statewide administrative agency" ' " ' and as ' " 'a constitutionally created arm of the state [it has] virtual autonomy in self-governance.' " ' " (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1487.)  "[I]t is well settled that the delegated powers that are necessary or convenient for the effective administration of the University's business include quasi-judicial administrative authority to resolve individualized employment disputes, by applying University policies to particular cases." (*Ibid.*)  "Such 'governance' of University activities requires due process in the carrying out of its personnel functions, such as adopting and administering employment policies. . . .  [I]n general, the University's consideration of an employment-related complaint 'cannot be so perfunctory or arbitrary as to violate the due process guarantee of the state or federal Constitutions.'  . . . ' "[T]he power [to dismiss public employees] may not be exercised arbitrarily in disregard of the employee's constitutional rights." ' "  (*Ibid.*)

---

5      Levi requests that we take judicial notice of excerpts of minutes from meetings of the Regents, dated May 15, 2008, February 5, 2009, and November 19, 2009.  She argues the documents are relevant to rebut arguments made by the Regents and Weinreb in their respondents' brief regarding whether they had to provide Levi notice before reducing her salary and appointment.  The meeting minutes that Levi requests we judicially notice were not presented to the trial court.  Although we may take judicial notice of official acts and public records (Evid. Code, § 452), "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court.  Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' "  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)  No exceptional circumstances exist here that would justify deviating from that rule.

41

*A. Grievances*

Levi contends the University denied her due process by failing to issue a final report on her September 2012 and June 2013 grievances, which was a violation of APM-140, a general University policy governing grievances presented by academic appointees. Defendants argue Levi forfeited this issue because she did not allege it as a basis for her due process claim or raise the argument in summary judgment proceedings. They further assert that even if Levi did not forfeit the issue, APM-140 does not afford due process rights; instead, the policy merely allowed Levi to elevate her grievance to the next level if the University failed to issue a report. We agree with the Regents and Weinreb.

In her amended complaint, Levi alleged the "[University's] failure to issue a report regarding [her] grievances violates UCSD's grievance policies, processes and procedures, and denies [Levi] due process to which she is entitled. Accordingly, [Levi] has exhausted, or is excused from exhausting, her administrative remedies." Although Levi made this general allegation, she did so in the context of setting forth her exhaustion of administrative remedies. In setting forth her cause of action for violation of due process, Levi did not make any allegations regarding APM-140. Levi's nonreliance on that policy and the University's failure to issue a report on her grievances to support her due process claim is further confirmed by the fact that Levi did not make the argument in opposing summary judgment.

In any event, even if Levi did not forfeit the argument, she did not raise a triable issue of fact as to whether the University's failure to issue a report on her grievances constituted a due process violation. APM-140 sets forth a three-step procedure for

42

resolving grievances for academic appointees. Under the policy, after a grievant files a step two formal grievance, the "reviewer shall send a written response to the grievant and the grievance liaison, . . . includ[ing] a statement that the grievance is denied or upheld in whole or in part and that the grievant has the right to appeal the decision to Step III of the grievance procedure." APM-140 further provides that if the University failed to meet any deadline, the grievant could move the grievance to the next step in the process.

Levi did not allege or present any evidence that the Regents or Weinreb prevented her from elevating her grievance from step two to step three in the grievance process. Accordingly, she has not raised a triable issue of fact on her due process claim based on the University's failure to issue a report on her grievances.

B. *Reduction in Appointment and Salary Without Notice*

Levi argues she raised a triable issue of fact on her due process cause of action because the Regents and Weinreb involuntarily reduced her time without notice and an opportunity to respond, which violated University policies.

1. *Involuntary Reduction Policy*

Under the University's policies, it must give at least 90 days' advance written notice before implementing an involuntary reduction of time for a health sciences clinical professor such as Levi. "An involuntary reduction in time occurs when the University reduces an academic appointee's percentage of effort prior to his or her established ending date because of budgetary reasons, lack of work, and/or programmatic needs." (UCSD Policy and Procedure Manual, Personnel - Academic, Section 230-7.)

Defendants argue they were not required to give Levi notice because her total appointment between the University and the VA was never reduced below 100 percent, and her salary was never reduced below her guaranteed salary of $115,200. To support their position, the Regents and Weinreb provided a declaration from Ries, associate vice chancellor for academic affairs, who was responsible for overseeing academic appointments and any actions that could involve a change in an academic appointment. According to Ries, reducing Levi's University appointment from 100 percent to 50 percent did not constitute an involuntary reduction of time because her total commitment to the University remained at 100 percent, split evenly between the University and the VA. Further, because Levi's salary after reduction of her University appointment still exceeded her guaranteed covered compensation, the change was not considered a layoff or a reduction in time or salary.

In May 2011, the University approved Levi's three-year reappointment and merit advancement to health sciences clinical professor, step IV, "at 100% time in the Department of Ophthalmology, . . . effective July 1, 2011, through June 30, 2014." The University notified Levi that in conjunction with her reappointment, the ophthalmology department would implement an "associated increase in annual base salary (X) to $111,800 (10/01/09 salary scale)." In 2011, Levi also had a 50 percent appointment with the VA and corresponding VA pay in the amount of $119,582.00. In March 2013, Espiritu sent Levi a letter reducing her University appointment to 50 percent. As a result, the University also reduced Levi's University salary. Before March 2013, Levi's University pay was $115,200, which was 100 percent of her base salary. After March

44

2013, Levi's University pay was $57,600, which was 50 percent of her base salary. Espiritu testified that as a result of reducing Levi's appointment from 100 percent to 50 percent, she was deemed "part time" with the University and her required "effort" at the University was 20 hours per week.

Although the University presented evidence that Levi's appointment reduction from 100 percent to 50 percent did not qualify as an "involuntary reduction in time," we conclude Levi raised a triable issue of fact on the issue. In 2011, the University notified Levi that it was reappointing her to the ophthalmology department at 100 percent time and providing her a corresponding base salary increase. Before expiration of the reappointment term, the University reduced Levi's appointment from 100 percent to 50 percent and decreased her salary as a result. According to Espiritu, as a result of the appointment reduction, Levi's position at the University was classified as part time and her "effort" was reduced to 20 hours per week. According to University policy, an "involuntary reduction in time occurs when the University reduces an academic appointee's percentage of effort" prior to the expiration of her appointment term. (UCSD Policy and Procedure Manual, Personnel - Academic, Section 230-7.) Accordingly, a triable issue of fact remains as to whether the University was required to provide Levi advance notice prior to reducing her appointment.

2. *Corrective Action Policy*

Levi also raised a triable issue of fact as to whether the University was required to provide her notice and an opportunity for a hearing before it reduced her salary as a result of corrective action. Under University policy, a "[c]orrective action is a written warning,

45

written censure, suspension without pay, *reduction in salary*, or demotion for good cause, including but not limited to misconduct, unsatisfactory work performance, dereliction of duty, or violation of University policy." (General University Policy Regarding Academic Appointees, Non-Senate Academic Appointees, Corrective Action and Dismissal, APM-150.) Prior to instituting a corrective action, the University should engage in efforts to resolve the issue informally. (*Ibid.*) The University should also provide written notice prior to initiating a salary reduction. (*Ibid*.)

The University presented evidence that the policy concerning corrective action did not apply to Levi because she did not suffer a reduction in her "guaranteed salary" and her salary was reduced due to lack of sufficient funds to cover her University appointment, rather than as a corrective action. However, as we previously explained, Levi's University-paid salary was reduced from $115,200, which was 100 percent of her base salary, to $57,600. In Espiritu's letter notifying Levi of her appointment and salary reduction, he identified concerns that Levi was not meeting her clinical services responsibilities and was not covering her base salary and expenses. Levi's failure to meet her clinical responsibilities could constitute "unsatisfactory work performance" and thereby implicate the corrective action policy. Based on the University's reduction of Levi's University-paid salary and the reasons given for that action, we conclude there is a triable issue of fact as to whether the University was required to comply with its corrective action policy by providing Levi notice and an opportunity for a hearing.

Lastly, we do not consider Levi's argument that the University violated the Regents' policy on faculty conduct and administration of discipline (APM-016) because

46

she did not raise that policy in her amended complaint as a basis for her due process claim or in summary judgment proceedings. (*Sacks, supra*, 7 Cal.App.4th at p. 962.)

## C. *Opportunity to Cure Deficiencies*

Citing a University policy concerning the health sciences compensation plan (APM-670), Levi argues the University had to give her an opportunity to return to good standing before reducing her salary and appointment. Based on our conclusion that Levi raised a triable issue of fact on her due process claim on other grounds, we need not consider Levi's argument pertaining to APM-670. "If a cause of action is not shown to be barred in its entirety, no order for summary judgment—or adjudication—can be entered." (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 975; see also *See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889, 908, fn. 7.)

## VII. *Bane Act Claim*

Levi contends the trial court erred in granting summary judgment on her Bane Act claim because a triable issue of fact exists as to whether defendants interfered with her constitutional and statutory rights by threats, intimidation, or coercion. We reject Levi's argument.

" 'The Bane Act and related statutes "are California's response to [the] alarming increase in hate crimes." ' " (*Cabesuela v. Browning-Ferris Indus.* (1998) 68 Cal.App.4th 101, 110.) However, the Bane Act is not limited to hate crimes. (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 843.) It can also be asserted in the employment context. (*Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1456-1457; *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 862.) The Bane Act provides a

47

civil remedy for persons whose exercise of constitutional rights has been interfered with by "threat, intimidation or coercion." (Civ. Code, § 52.1, subd. (a); see *Venegas,* at pp. 841-843; *Jones v. Kmart Corp*. (1998) 17 Cal.4th 329, 331.) To obtain relief under Civil Code section 52.1, a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion. (*Venegas,* at pp. 841-843.)

"Speech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat." (Civ. Code, § 52.1, subd. (j).)

Defendants moved for summary judgment, arguing Levi had not alleged and could not establish threats, intimidation, or coercion within the meaning of Civil Code section 52.1. Levi alleged Weinreb interfered with her rights to be free from discrimination, harassment, and retaliation in the workplace by means of threats and intimidation. She claimed Weinreb interfered with those rights by physically and verbally demeaning, intimidating, and bullying her and spreading falsehoods about her and the residency program. Levi relied on the incident in July 2011 when Weinreb stood up during a meeting with her, towered over her, banged his fist on the table and said, " 'I can remove you as program director if you keep fighting me every step of the way.' " She also relied

on the incident in December 2011 when Weinreb became angry and said, " 'I think I made myself clear' " after Levi questioned a policy decision. Levi felt frightened, intimidated and threatened by Weinreb.

Levi did not allege or produce evidence that Weinreb committed physical violence against her. Instead, she relied on his alleged threats and intimidation, which made her feel afraid and physically threatened. However, Levi did not establish that Weinreb made a threat of violence against her and that a reasonable person would have feared, based on Weinreb's statements, that violence would be committed against him or her. (Civ. Code, § 52.1, subd. (j).) Accordingly, Levi's Bane Act claim fails.

## VIII. *Levi's Evidentiary Objections*

Levi argues the trial court erred by refusing to consider her evidentiary objections. We disagree.

Written objections to evidence submitted in support of or opposition to a motion for summary judgment or summary adjudication must be in one of two acceptable formats, be numbered consecutively, and: "(1) Identify the name of the document in which the specific material objected to is located; [¶] (2) State the exhibit, title, page, and line number of the material objected to; [¶] (3) *Quote or set forth the objectionable statement or material*; and [¶] (4) State the grounds for each objection to that statement or material." (Rule 3.1354(b), italics added.) The trial court may refuse to consider written objections that do not comply with rule 3.1354. (*Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 8.) We review the trial court's ruling on evidentiary objections for an abuse of discretion. (*Garrett v. Howmedica Osteonics*

49

*Corp*. (2013) 214 Cal.App.4th 173, 181; *Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82-83.)

Here, Levi filed multiple objections to each declaration the Regents and Weinreb had submitted to support their motion. The objections did not quote or set forth the objectionable statements or material. Instead, Levi only identified paragraph numbers within the declarations. In its tentative decision, the trial court overruled the objections for failure to comply with rule 3.1354(b). The court later confirmed this ruling.

Levi contends her objections complied with rule 3.1354(b) because she set forth the objectionable material using paragraph numbers. However, the trial court was not required to speculate as to whether Levi was objecting to an entire paragraph within a declaration or only specific statements within the paragraphs she had identified. We find no abuse of discretion in the trial court's ruling that Levi failed to comply with rule 3.1354(b).

Levi next contends the trial court erred by finding her revised objections, filed at the time of the hearing on the summary judgment motion, were untimely under rule 3.1354(a). Rule 3.1354(a) provides, "[u]nless otherwise excused by the court on a showing of good cause, all written objections to evidence in support of or in opposition to a motion for summary judgment or summary adjudication *must be served and filed at the same time as the objecting party's opposition or reply papers are served and filed*." (Italics added.) Levi's revised objections did not comply with this rule and she did not make a showing of good cause for the late filing. Thus, we find no abuse of discretion in the trial court's ruling.

50

We also reject Levi's suggestion that the court abused its discretion in finding the revised objections untimely because it had accepted them at the time of the summary judgment motion hearing. Based on our review of the record, the trial court did not "accept" Levi's revised objections as timely. Rather, it informed Levi's counsel that it did not think Levi was entitled to file objections twice, but she could "file whatever [she] thought she] need[ed] to file," presumably to preserve a claim for appeal.

Based on the foregoing, we conclude the trial court acted within its discretion on its rulings pertaining to Levi's evidentiary objections.

IX. *Punitive Damages*

In their summary judgment motion, the Regents and Weinreb argued that Levi's prayer for punitive damages failed because the Regents are immune from punitive damages claims, and Levi could not establish the Regents or Weinreb engaged in conduct with malice, oppression, or fraud. Levi conceded that a public entity cannot be subject to punitive damages. On this issue, the trial court's order granting summary judgment stated, "Defendants' motion is granted. [¶] Plaintiff concedes that a public entity such as UCSD is not subject to punitive damages. Also, absent a viable cause of action there is no basis to award punitive damages."

Levi did not challenge the trial court's ruling on punitive damages in her opening brief. Thus, defendants argue she forfeited the issue on appeal. In her reply brief, Levi contends her punitive damages claim survives on remand because the trial court only ruled that the Regents were not subject to punitive damages, but made no decision pertaining to Weinreb.

51

We do not read the trial court's order as narrowly as Levi. While the trial court specifically stated that Levi conceded the punitive damages issue related to the University, it went on to state that it *also* found there was no basis for awarding punitive damages absent a viable cause of action. Thus, the trial court's ruling was not limited to the Regents.

In general, arguments raised for the first time in an appellant's reply brief are forfeited on appeal unless good reason has been shown for the failure to raise them earlier. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10.) Although Levi did not specifically raise the issue of punitive damages in her opening brief, we conclude she did not forfeit the issue on appeal because she challenged the trial court's finding that there was not a viable cause of action to support a punitive damages award by arguing she raised a triable issue of fact as to each cause of action. Thus, to the extent a viable cause of action allowing for punitive damages survives, Levi's punitive damages prayer on that cause of action survives.

DISPOSITION

The judgment is reversed and the order granting defendants' motion for summary judgment on Levi's amended complaint is vacated. The court is directed to enter a new order denying defendants' motion for summary judgment and granting their alternative motion for summary adjudication as to Levi's first cause of action for retaliation under the FEHA, third cause of action for gender discrimination, fourth cause of action for gender harassment, fifth cause of action for failure to prevent harassment, discrimination,

52

and retaliation, and seventh cause of action for Bane Act violations.  Levi is awarded her costs on appeal.


DATO, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.